Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com

United States District Court
Eastern District of New York

1:19-cv-00302-ENV-SJB

Keith Kennedy, individually and on behalf
of all others similarly situated

                              Plaintiffs

              - against -

Mondelēz Global LLC

                              Defendant

First Amended Complaint

Plaintiffs by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.     Mondelēz Global LLC ("defendant") manufactures, distributes, markets, labels and sells products identified as "Grahams Crackers" or "Grahams" under the under the Honey Maid brand ("Products").

2.     The Products are available to consumers nationwide from third-party retailers, including brick and mortar and online stores and directly available through defendant's website.

3.     The varieties include: Chocolate Grahams, Cinnamon Grahams, Fresh Stacks, Honey Grahams,  Honey Grahams Family Size, Honey Maid Star Wars, Low Fat Cinnamon Grahams, Low Fat Honey Grahams, Original Graham Crackers (Nabisco Graham Brand) and Vanilla Grahams.

4.     The Products can be classified into the following categories and varieties as found

on the Products' website.[1]

| Categories | Varieties |
|---|---|
| Honey Maid Graham Crackers | Honey |
| Honey Maid Graham Crackers (flavored) | Chocolate |
| | Cinnamon |
| | Vanilla |
| Nabisco Original Graham Crackers | n/a |
| Low Fat Honey Maid Graham Crackers | Honey |
| | Cinnamon |

5.     The Honey Maid Graham Crackers (Honey) and the Nabisco Original Graham Crackers are the flagship Products available in the most locations for sale.

6.     The common relevant front label representations include (1) a tan, khaki-colored cracker and (2) 8g of whole grain per 31g serving.

---

[1] https://www.honeymaid.com/varieties

 

7.     The common relevant front label representations include (1) a tan, khaki-colored cracker and (2) 8g of whole grain per 31g serving.

8.     The Nabisco Products front labels' separately contain (1) a graphic of a swaying, unrefined stalk of wheat, (2) "ORIGINAL," and (3) product name of "Grahams."

9.     The side panel of the Nabisco Grahams Products contains the below statements.



- 8g of Whole Grain Per 31g Serving
- No High Fructose Corn Syrup
- More than a century of great graham know-how.
- A sensible snack with a satisfying hint of sweetness.
- NABISCO Grahams - a tradition of wholesome nutrition.

10.    The Honey Maid Products front labels' separately contain (1) "Made with Real Honey," (2) a picture of a honey dipper, (3) "No High Fructose Corn Syrup," (4) the brand name Honey Maid beneath a bumble bee, (5) a product name of Grahams.

I.    Background

11.    Graham flour is a coarse-ground "unbolted" flour, made from the whole grain – endosperm, germ, and bran.

12.    White flour is refined so that only the endosperm of the wheat remains.

13.    Average Americans fondly recall graham crackers as a hearty snack when growing up, as opposed to a dessert, something consumed after recess or at halftime of a youth soccer game.

14.     Graham crackers were valued because they provided valuable nutrients ("whole grains") and energy, and provided smaller amounts of refined white sugar than cookies.

15.     The whole grain content distinguished the graham cracker from other crackers which were made with mostly white flour.

16.     Graham crackers are distinct from cookies and are marketed through different channels and are classified in different categories for the purposes of retail distribution.

17.     Defendant markets and promotes the Products as "Honey Maid Crackers" instead of cookies, evinced by the Honey Maid website.



Our Honey Maid graham crackers have whole grain and real honey.

MADE WITH WHOLE GRAINS

You can eat them on their own or add them to a recipe for a delicious and wholesome treat.

8 - 10g of whole grain per 25 - 31g serving.

18.     In its sales to institutional customers such as schools, community organizations and corporations, the Products are also classified as crackers.[2]

---

[2] https://www.foodservice-snacks-desserts.com/en/productsandbrands/ourbrands



19.    Like defendant, consumers know that cookies contain: exclusively white, refined flour, refined sugar, confectionary inclusions like chocolate chips, a round shape and chewy consistency.

20.    Consumers also know that products sold as crackers contain: less white refined flour than cookies, less sugar, a salty or savory instead of sweet flavor, a flat shape and a crispy or crunchy texture.

21.    The whole grain content distinguished the graham cracker from other crackers which were made with mostly white flour.

## II.  Product Names Misleading as to Amount of Graham Content

22.    Consumers expect foods to have common or usual names which contain simple and direct terms to indicate its basic nature and characterizing properties or ingredients.

23.    Reasonable consumers expect the Products' composition to conform to their name.

24.    Either read as "grahams" or "graham crackers," the expectation is that such a product will contain more graham flour than white flour.

25.    It would not be unreasonable for consumers to expect the Products to only contain graham flour because such products exist and this is the name provided on the labels.

26.    Dictionaries confirm what reasonable consumers expect when it comes to graham crackers, defining them as "a slightly sweet cracker made of whole wheat flour" and "a semisweet cracker, usually rectangular in shape, made chiefly of whole-wheat flour."[3]

27.    The representations as "grahams" and/or "graham(s) crackers" is misleading because graham flour (whole grain wheat flour ) is present in an amount less than white flour (unbleached enriched flour).

<u>Honey Maid</u>                                      <u>Nabisco Grahams</u>

INGREDIENTS: UNBLEACHED ENRICHED FLOUR (WHEAT FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE {VITAMIN B1}, RIBOFLAVIN {VITAMIN B2}, FOLIC ACID), GRAHAM FLOUR (WHOLE GRAIN WHEAT FLOUR), SUGAR, CANOLA OIL, HONEY, LEAVENING (BAKING SODA AND/OR CALCIUM PHOSPHATE), SALT, SOY LECITHIN, ARTIFICIAL FLAVOR.

INGREDIENTS: UNBLEACHED ENRICHED FLOUR (WHEAT FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE {VITAMIN B1}, RIBOFLAVIN {VITAMIN B2}, FOLIC ACID), GRAHAM FLOUR (WHOLE GRAIN WHEAT FLOUR), SUGAR, SOYBEAN OIL, MOLASSES, PARTIALLY HYDROGENATED COTTONSEED OIL, LEAVENING (BAKING SODA AND/OR CALCIUM PHOSPHATE), SALT.

Unbleached Enriched Flour (Wheat Flour, Niacin, Reduced Iron, Thiamine Mononitrate {Vitamin B1}, Riboflavin {Vitamin B2}, Folic Acid), Graham Flour (Whole Grain Wheat Flour), Sugar, Soybean And/Or Canola Oil, Honey, Leavening (Baking Soda And/Or Calcium Phosphate), Salt, Soy Lecithin, Artificial Flavor.

Unbleached Enriched Flour (Wheat Flour, Niacin, Reduced Iron, Thiamine Mononitrate {Vitamin B1}, Riboflavin {Vitamin B2}, Folic Acid), Graham Flour (Whole Grain Wheat Flour), Sugar, Vegetable Oil (Soybean And/Or Canola And/Or Palm And/Or Partially Hydrogenated Cottonseed Oil), Molasses, Leavening (Baking Soda And/Or Calcium Phosphate), Salt.

28.    The proportion of this component has a material bearing on price or consumer acceptance of the Products because it is more expensive and contains more nutrients than non-whole grain flours.

29.    The labeling is misleading in that it uses a product name that includes one of the product's ingredients (graham flour) but fails to mention one other notable ingredient (white flour).

---

[3] https://www.dictionary.com/browse/graham-cracker

30.     The labeling of a food with two or more ingredients is misleading by designation of such food with a name which includes or suggests the name of one but not all ingredients, even though the names of all such ingredients are stated elsewhere in the labeling.[4]

31.     The Products are more appropriately identified as or described by the following:

| Alternate Name | Product Claim |
|---|---|
| • "Crackers Made with Graham Flour" | • "Crackers Made with Graham Flour" |
| • "Graham-Flavored Cracker" | |
| • "Crackers with X% Graham Flour" | |

32.     The Product's name and designation as "grahams" and/or "graham crackers" may have been appropriate at a time when (1) their composition contained more graham than non-graham flour and (2) consumers and the public were not aware of the benefits from consumption of whole grains vis-à-vis refined grains.

33.     Unless fixed by statute (butter), standard of identity (margarine) or the establishment of a common or usual name ("onion rings made from diced onions"), there is nothing preventing the Products to be labeled and/or described accurately.

34.     An example is the vanilla wafers of Nabisco, predecessor to defendant.

35.     From 1898 to 1967, the lightweight, thin, vanilla flavored cookie was called "Vanilla Wafers."

36.     In the early 1960s, the vanilla standard of identity was established to prevent consumers from being misled by products purporting to contain vanilla.

37.     The amount and/or type of vanilla in the "Vanilla Wafers" of Nabisco did not conform to the new regulations, so they simply changed their name and consumers are not misled.

Vanilla Wafers (pre-1967)                    Nilla Wafers (present day)

---

[4] 21 C.F.R. § 101.18(b)

 

### III. Not Uniform Name

38.     The Products' name and description is misleading because graham cracker products which are predominantly graham flour, are available for sale in the same places where the Products are sold.

 



39.     Defendant's sister company, Mondelēz International Foodservice, sells Honey Maid and Nabisco Grahams products in the food service and institutional channel.

40.     These Honey Maid Products contain more graham flour than white flour.[5]

INGREDIENTS: GRAHAM FLOUR (WHOLE GRAIN WHEAT FLOUR), UNBLEACHED ENRICHED FLOUR (WHEAT FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE \{VITAMIN B1\}, RIBOFLAVIN \{VITAMIN B2\}, FOLIC ACID), SUGAR, CANOLA OIL, HONEY, LEAVENING (BAKING SODA AND/OR CALCIUM PHOSPHATE), SALT, WHEAT STARCH, ARTIFICIAL FLAVOR.\PAR }

41.     The Nabisco Products contains more graham flour than white flour.[6]

---



INGREDIENTS: GRAHAM FLOUR (WHOLE GRAIN WHEAT FLOUR), UNBLEACHED ENRICHED FLOUR (WHEAT FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE \{VITAMIN B1\}, RIBOFLAVIN \{VITAMIN B2\}, FOLIC ACID), SUGAR, CANOLA AND/OR PALM OIL, MOLASSES, LEAVENING (BAKING SODA AND/OR CALCIUM PHOSPHATE), SALT, WHEAT STARCH.\PAR }

42.     These institutional version of these products are marketed towards schools, youth groups and other entities where standards are in place for what is provided to students and others enrolled in any educational or recreational programs.

43.     To receive federal and/or state assistance in purchasing food in an educational and youth context, the USDA Food and Nutrition Services has grain crediting standards – i.e., kids have to receive x grams of whole grains per day.

44.     If defendant only offered the retail version of the Products towards school and institutional customers, they would not purchase it because it would not meet any grain crediting or other nutritional standards.

45.     Large well-organized institutions are capable of protecting the needs of their members, whether through advocacy to the government to promote children's nutrition and the government's responsiveness in establishing requirements for what kids should eat.

46.     This scenario has a double benefit for defendant.

47.     First, it gains the sales to its institutional customers.

48.     Second, the students, participants and others who consume the products identified as Honey Maid and Nabisco Grahams will have their experience and exposure to these Products based on the version containing more graham, whole grain wheat flour, than white flour.

49.     When these same students and participants become customers of defendant through purchasing the Products or directing their purchase via parents, they will be receiving a *different* and nutritionally inferior food.

50.     Because they would have been familiar with the Products from school, religious group or sports, there would be no need to even look at the small print disclaimers buried in the ingredient lists.

51.     The Products' names of "Grahams" and "Graham Crackers," referring to products which are mostly white flour, are not (1) "uniform among all identical or similar products" and are (2) "confusingly similar to the name of any other food that is not reasonably encompassed within the same name."[7]

52.     "Grahams" and "Graham Crackers" do not identify what distinguishes the Honey Maid and Nabisco Grahams Products from other foods which are accurately named and described as graham crackers.

53.     Since the products have identical common or usual names and descriptions, consumers will expect the products to be identical or substantially similar with respect to their characterizing ingredients.

54.     Because the Products and similarly available products differ substantially or significantly with respect to the amounts and/or proportions of their characterizing ingredients

---

[7] 21 C.F.R. §102.5(a).

(whole grain graham flour), consumers cannot judge them against each other fairly and will often choose the lesser-quality product.

IV. Sweetening Agents in Products

55.    Consumers expect and are familiar with graham crackers being <u>mildly</u> sweetened with honey or molasses, as opposed to refined, white sugar.

56.    The Products' claims to not contain "high fructose corn syrup" (HFCS) makes consumers expect that the non-traditional sweeteners – honey and molasses – are at least the predominant sweeteners in the Product.

57.    This is because consumers associate HFCS with a form of "sugar" the media and public health advocates have singled out for its purported negative qualities.

   A.   <u>Honey Maid – Honey Representations</u>

58.    Honey is a "thick, sweet, syrupy substance that bees make as food from the nectar of plants or secretions of living parts of plants and store in honeycombs."[8]

59.    The Honey Maid Products are represented as traditional graham crackers through the term "Grahams," darkened color crackers, whole grain claim (8 g) and emphasis on honey through statements - "made with real honey," "Honey Maid," – and images – flying bee, honey dipper.

60.    Since the superficial criteria for traditional graham crackers have been satisfied by the front label representations, reasonable consumers will expect not necessarily that honey will be the exclusive sweetening agent in the Honey Maid Products but that it will be the predominant sweetener, vis-à-vis sugar.

---

[8] Webster's New World College Dictionary (Wiley Publishing, Inc., Cleveland, Ohio 2010).

61.     After all, graham crackers are commonly understood as being different than a cookie or even traditional cracker that may contain sugar.

62.     The Honey Maid Products Honey Representations are misleading because the amount of honey is less than the amount of sugar as indicated on the ingredient list.

63.     Moreover, the Honey Maid Products list "artificial flavor" in the ingredient list.

64.     While there's no way to be certain if the artificial flavor simulates honey, this is likely the case because the Honey version does not contain any other ingredients that could impart a semblance of flavor, other than honey.

65.     So honey will contribute flavor, but this will be enhanced by the artificial flavor.

66.     The artificial flavor is not indicated on the front label which is misleading and contrary to law.

67.     It is highly probable and likely that honey is not even added to the Honey Maid Products separately.

68.     According to the treatise, Bakery Products: Science and Technology,

> The viscous nature of honey makes it difficult to handle and scale accurately in the bakery. This problem is resolved by offering the baker a "churned" honey form, plasticized honey with invert sugar and a honey-starch complex at a ratio of 75% honey to 23.5% starch

> W.K. Nip, Chapter 7, "Sweeteners," W. Zhou and Y. H. Hui, Eds., p. 146, Wiley-Blackwell, Oxford, UK, 2006.

69.     These practical difficulties make intuitive sense to anyone who's ever handled honey.

70.     There is no prohibition on adding ingredients in a combination form in the course of food processing – it makes sense to do things different when done on a commercial scale.

71.     However, the implications are for truthful and non-misleading labeling because the honey would actually be a component of a honey-invert sugar blend.

72.     Because a honey-invert sugar blend is not a standardized food nor has a common or usual name, its component ingredients are required to be separated out by order of predominance by weight, as defendant correctly does in the ingredient list.

73.     This would mean defendant listed the components of the compound ingredient in the correct way on the ingredient list, but only promoted *part* of that compound industrial ingredient on the front labels, where there were no requirements as to representing ingredients like exist for the ingredient list, other than to not mislead.

74.     However, defendant has chosen to add a sweetening combination of honey and sugar yet only promotes the honey on the front label, which is misleading because

> Identifying a blend or a mixture of honey and another sweetener only as "honey" does not properly identify the basic nature of the food. You must sufficiently describe the name of the food on the label to distinguish it from simply "honey" (21 CFR 102.5(a)).[9]

75.     This would mean that labeling one element of the sweetening ingredient as honey would not "accurately identify or describe the basic nature of the food or its characterizing properties or ingredients (see section 403(i) of the FD&C Act, 21 CFR 101.3(b), and 21 CFR 102.5(a)): for example, "Blend of honey and corn syrup," if the food has more honey than corn syrup (conversely, "Blend of corn syrup and honey," if the food has more corn syrup than honey)."[10]

V.  Product Color and Name and Misleading as to Implied Nutrient Content

76.     Consumers increasingly seek products made with whole grains for its numerous

---

[9] U.S. Food & Drug Admin., Draft Guidance for Industry:  Proper Labeling of Honey and Honey Products (Apr. 2014) ("Question 4. If a food consists of honey and a sweetener, such as sugar or corn syrup, can I label the food as only "honey"?").

[10] Id., Question 5, If a food consists of honey and a sweetener, such as sugar or corn syrup, how shall I label the food?

health benefits compared to refined white flour.

77.    For example, the 2015 Dietary Guidelines for Americans recommends that at least half of the grains in a healthy diet should be whole grains.[11]

78.    The Products are promoted as a "whole grain" cracker through the Product Name, "Grahams," description as "Graham Cracker," "Made with 8g of Whole Grain (per 31g serving)," wheat stalk (Nabisco Grahams) and their noticeably dark-tan hue.

A.   Darker Color of Products Caused by Small Amount of Non-Traditional Sweeteners

79.    Consumers associate darker hues in grain products with whole grains.

80.    The presence of honey and molasses then would appear to serve their true function: imparting a darker color to a product which would be significantly whiter if based solely on the ratio of white flour to whole grain wheat, graham flour.

81.    According to W.K. Nip,

With mostly reducing sugars in its sugar profile, honey browns easily during baking, adding a natural dark color to baked products such as bread, crackers, and other products.

Chapter 7, "Sweeteners."

82.    As already shown that honey and molasses are not the primary contributors to the Products' sweetening, they are misleadingly used to give consumers the impression the Products contain *more graham flour* than actually is present.

83.    However, the amount of honey is much smaller than the sugar, and honey is better characterized as a flavoring agent for the Products.

---

[11] U.S. DEP'T OF AGRIC. AND U.S. DEP'T OF HEALTH & HUMAN SERVS., *Dietary Guidelines for Americans 2015–2020* (8th ed. 2015), *available at* http://goo.gl/qnyfLi (click "A Closer Look Inside Healthy Eating Patterns" under "Chapter 1. Key Elements of Healthy Eating Patterns").

84.    The misrepresentation of honey in the production and sale of graham crackers is unfortunately old hat.

> This product was sold as milk and honey graham crackers but contained little or no milk and very little honey in comparison with the amount of sugar that was used as the principal sweetening agent.
>
> …
>
> The article was alleged to be adulterated in that a product containing little or no milk, and very little honey in comparison with sugar (sucrose) the principal sweetening agent, had been substituted wholly or in part for the article.
>
> The article was alleged to be misbranded in that the statement "Milk and Honey Grahams" was false and misleading and tended to deceive and mislead the purchaser.

FDA Notices of Judgment, 29838. Adulteration and misbranding of graham crackers. U. S. v. 310 Cartons of "Burry's Crisp Brown Milk and Honey Grahams." Consent decree of condemnation and destruction. (F. & D. No. 43972. Sample No. 21810-D.)

B.    "Grahams" and "Graham Crackers" Misrepresent the Amount of Whole Grain Content Relative to Refined Grains

85.    While the Products' labels say "Made with 8g of whole grain per 31g serving," reasonable consumers would not likely be able to use this information to calculate the amount of the serving that is not whole grain.

86.    This is because the Products do not disclose that the difference between 31 and 8, 23, is the amount of refined grain per serving.

87.    The FDA cautioned manufacturers against misleading consumers as to whole grain content of foods:[12]

> 7.    Question: Does the term "whole grain" mean the same as "100 percent whole grain"? If a product is labeled as "whole wheat bagel" or "whole wheat

---

[12] Draft Guidance for Industry and FDA Staff: Whole Grains Label Statements," Docket No. 2006D-0066, ("Whole Grain Guidance").

pizza," how much whole wheat should it contain? What is graham flour?

Answer: FDA has not defined any claims concerning the grain content of foods. However, the agency has established standards of identity for various types of cereal flours and related products in 21 CFR Part 137, including a standard of identity for "whole wheat flour" (§ 137.200) and "whole durum flour" (§ 137.225). Graham flour is an alternative name for whole wheat flour (§ 137.200).

Depending on the context in which a "whole grain" statement appears on the label, it could be construed as meaning that the product is "100 percent whole grain." We recommend that products labeled with "100 percent whole grain" not contain grain ingredients other than those the agency considers to be whole grains.

88.     FDA has prevented misleading whole grain representations like those described in the Products where whole grain claims are in the product names – "HiHo Deluxe WHOLE WHEAT Crackers" and "Krispy WHOLE WHEAT Saltine Crackers," when they were mainly white flour.[13]

89.     However, misleading whole grain claims still exist, and "[M]any reasonable consumers will likely understand 'whole grain' [claims] to mean that all, or virtually all, of the food product is whole grain, or that all of the grain ingredients in the product are whole grains.[14]

90.     There are long established relationships between ingredients and nutrients such that when a label draws attention to an ingredient, it is impliedly highlighting the presence of the associated nutrient.[15]

91.     By using a product name which contains graham flour (whole grain), the implied message is that the product provides at least 10 percent (a good source) or above 20 percent (high)

---

[13] CSPI Petition to Prohibit Misbranding of Whole Wheat Products and to Promulgate Food Labeling Regulations Concerning Products Made with Whole Wheat, Docket No. 93P-0227 (Jun. 25, 1993).
[14] In the Matter of Draft Guidance for Industry and FDA Staff: Whole Grains Label Statements, Docket No. 2006-0066 Comments of the Staff of the Bureau of Consumer Protection, the Bureau of Economics, and the Office of Policy Planning of the Federal Trade Commission April 18, 2006
[15] 21 U.S.C. § 343(r)(1); 21 C.F.R. § 101.65.

of the RDI (Reference Daily Intake) or the DRV (Daily Reference Value) of fiber.[16]

92.     However, the Products are not a good source of, nor high, in fiber, as the nutrition facts reveal that none of the versions have more than 1g of fiber (4% or less).

Honey Maid             Nabisco Grahams

93.     Consumer survey research by industry leaders has shown that an overwhelmingly significant number of consumers are choosing products with whole grain label statements as a means to increase fiber in their diet:[17]

- At least half of consumers expect that for every one gram of whole grain per serving,

---

[16] 21 C.F.R. § 101.54(b)-(c).
[17] FDA-2006-D-0298-0016, Exhibit 1a - "A Survey of Consumers Whole Grain & Fiber Consumption Behaviors, and the Perception of Whole Grain Foods as a Source of Dietary Fiber" - [Kellogg Company - Comment] (July 1, 2010); Docket ID: FDA-2006-D-0298, Guidance for Industry and FDA Staff: Whole Grains Label Statements.

there will be at least one gram of fiber;

- Two-thirds of consumers (67%) agree with the statement that whole grain foods are high in fiber; and

- 75% of consumers who observe claims that a product is made with, or contains whole grains, will expect the food to be at least a good source of fiber.

94. The Products' statement of identity – "grahams" – represent that a single ingredient constitutes 100% of the food.

95. The name of the ingredient – graham flour – purports to be the common or usual name of the product and constitute 100% of the Product, though it is mainly white flour.

96. The Product name is misleading because it purports to contain crackers made solely from a standardized ingredient – graham flour – yet it actually contains more of another, lower valued standardized ingredient.[18]

97. Defendant did not use the same brand name prior to 1989 and if it did, the Products contained more graham flour than white flour at that time.

98. In the alternative, the representations are not implied nutrient content claims and are statements about the presence of an ingredient (whole grains) that are perceived to add value to the Products.

99. The practice of passing off refined white flour mixed with small amounts of coarser bran (whole wheat) flour is a practice which has existed for over 100 years.[19]

100. While the form of the misleading practice has changed, the deception is no longer

---

[18] 21 C.F.R. §§137.105 (white flour), 137.200(a) (graham flour).
[19] J.A. Le Clerc et al., "Graham Flour: A Study of the Physical and Chemical Differences Between Graham Flour and Imitation Graham Flours," USDA Bureau of Chemistry Bulletin (164), Apr. 12, 1913

carried out by the miller, but by the marketer.

## VI. Conclusion

101.   The Products do not conform to the identity and composition of what they represent as and are affirmatively misleading to consumers.

102.   The proportion of this component has a material bearing on price or consumer acceptance of the Products because it is more expensive and desired by consumers.

103.   Had Plaintiff and Class members known the truth about the Products, they would not have bought the Product or would have paid less for it.

104.   The Products are represented as "wholesome" on the labels and accompanying materials yet this is misleading.

105.   The Products contain other representations which are misleading and deceptive.

106.   As a result of the false and misleading labeling, the Products are sold at premium prices – no less than $3.99 per 14.4 oz (408 g), excluding tax – compared to other similar products represented in a non-misleading way.

### Jurisdiction and Venue

107.   Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

108.   Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

109.   This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

110.   Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

111.   A substantial part of events and omissions giving rise to the claims occurred in this District.

Parties

112.   Plaintiffs are citizens of the States indicated below and reside in the county designated within that State.

113.   Plaintiffs below seek to represent a national class and state sub-classes of consumers in the states where they reside and purchased the products or services.

114.   If indicated, plaintiffs may have purchased the products or services in states other than where they currently reside due to reasons including (i) residence in proximity to or near state line such that it is customary for consumers to engage in multi-state transactions, (ii) change of residence within the statutory time period for the causes of action such that they purchased the products or services in more than one state.

115.   Plaintiff Keith Kennedy is a citizen of New York, Kings County.

116.   Plaintiff Anne Marie Barletta is a citizen of Massachusetts, Norfolk County.

117.   Plaintiff Chris Derchin is a citizen of New York, Richmond County.

118.   Plaintiff Kellie J. Nyanjom is a citizen of Kansas, Sedgwick County.

119.   Plaintiff Anne Marie Barletta is a citizen of Massachusetts, Norfolk County.

120.   Plaintiff Jennifer Stephens is a citizen of Idaho, Elmore County.

121.   Plaintiff Eric Boecker is a citizen of Ohio, Cuyahoga County.

122.   Plaintiff Robert T. Sousa is a citizen of California, San Diego County.

123.   Plaintiff Nancy Bierly is a citizen of Florida, Seminole County.

124.   Plaintiff Jared D'Argenio is a citizen of Florida, Palm Beach County.

125.   Plaintiff Lisa Williams is a citizen of Iowa, Pottawattamie County.

126.   Plaintiff Donald C. Hunt is a citizen of Washington, Stevens County.

22

127.   Plaintiff Craig Moskowitz is a citizen of Connecticut, Hartford County.

128.   Plaintiff Tiffni Altes is a citizen of California, Los Angeles County.

129.   Plaintiff Rachel Parks is a citizen of Virginia, Grayson County.

130.   Plaintiff Rachel Parks purchased the Products or Services in Ashe County, North Carolina.

131.   Plaintiff Kellie J. Nyanjom is a citizen of Kansas, Sedgewick County.

132.   Plaintiff Paula Wiley is a citizen of New Mexico, Bernalillo County.

133.   Plaintiff Frank Fuda is a citizen of Illinois, Will County.

134.   Plaintiff Leroy Jacobs is a citizen of Illinois, Cook County.

135.   Jane Doe plaintiffs are citizens of the states for which the identity of a named plaintiff has not been disclosed, but who were affected in the same manner as the Named Plaintiffs.

136.   The allegations as related to laws of other states where no named plaintiff has been disclosed serves as a placeholder upon joinder or amendment.

137.   Defendant is a Delaware limited liability company with a principal place of business in Deerfield, Illinois (Lake County) and upon information and belief, no member of defendant is a citizen of New York.

138.   During the class period, Named Plaintiffs and Jane Doe Plaintiffs purchased one or more of the Products for personal use, consumption or application with the representations described herein, for no less than the price indicated, *supra*, excluding tax, within their states and/or other states as described.

139.   Named Plaintiffs and Jane Doe Plaintiffs purchased the Products based upon the representations on the packaging.

140.   Named Plaintiffs and Jane Doe Plaintiffs would consider purchasing the Products

again if there were assurances that the Products' representations were no longer misleading.

Class Allegations

141.  The classes will consist of all consumers in all 50 states with sub-classes for the individual states.

142.  The Named Plaintiffs of: New York, will represent the state sub-class of persons who purchased any Products containing the actionable representations during the statutes of limitations.

143.  Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if Named Plaintiffs and Jane Doe Plaintiffs and class members are entitled to damages.

144.  Named Plaintiffs' and Jane Doe Plaintiffs' claims and the basis for relief are typical to other members because all were subjected to the same representations.

145.  Named Plaintiffs are adequate representatives because their interests do not conflict with other members.

146.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

147.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

148.  Named Plaintiffs' and Jane Doe Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

149.  Plaintiffs seek class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350, California Consumers
Legal Remedies Act, Civ. Code §§ 1750-1785 ("CLRA")
and Consumer Protection Statutes of Other States and Territories

150.   Named Plaintiffs and Jane Doe Plaintiffs assert causes of action under the consumer protection statutes of the all 50 states, with Named Plaintiffs asserting the consumer protection laws of their individual states.

a. Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et. seq.*;
b. Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et. seq.*;
c. Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et. seq.*;
d. California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* and Unfair Competition Law, Cal. Bus. Prof. Code §§ 17200- 17210 *et. seq.*;
e. Colorado Consumer Protection Act, Colo Rev. Stat § 6-1-101, *et. seq.*;
f. Connecticut Unfair Trade Practices Act, Conn. Gen Stat § 42-110a, *et. seq.*;
g. Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et. seq.*;
h. District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et. seq.*;
i. Florida Deceptive and Unfair Trade Practices, Act *Florida Statutes*§ 501.201, *et. seq.*;
j. Georgia Fair Business Practices Act, §10-1-390 *et. seq.*;
k. Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statutes § 480 1, *et. seq.* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statute § 481A-1, *et. seq.*;
l. Idaho Consumer Protection Act, Idaho Code § 48-601, *et. seq.*;
m. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et. seq.*;
n. Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et. seq.*;
o. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et. seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann § 365.020, *et. seq.*;
p. Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et. seq.*;
q. Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et. seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et. seq.*;
r. Massachusetts Unfair and Deceptive Practices Act, Mass. Gen Laws ch. 93A;
s. Michigan Consumer Protection Act, §§ 445.901, *et. seq.*;
t. Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et. seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn Stat. § 325D.43, *et. seq.*;
u. Mississippi Consumer Protection Act, Miss. Code An. §§ 75-24-1, *et. seq.*;
v. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*;
w. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et. seq.*;
x. Nebraska Consumer Protection Act, neb. Rev. Stat. § 59 1601 *et. seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et. seq.*;
y. Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et. seq.*;
z. New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et. seq.*;
aa. New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 1, *et. seq.*;
bb. New Mexico Unfair Practices Act, N.M. Sta. Ann. §§ 57 12 1, *et. seq.*;
cc. New York General Business Law ("GBL") §§ 349 & 350;
dd. North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et. seq.*;
ee. Ohio Rev. Code Ann. §§ 1345.02 and 1345.03; Ohio Admin. Code §§ 109;

ff.  Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et. seq.*;

gg. Oregon Unfair Trade Practices Act, Ore. Rev. Stat. § 646.608(e) & (g);

hh. Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1 *et. seq.*;

ii.  South Carolina Unfair Trade Practices Act, S.C. Code Law § 39-5-10, *et. seq.*;

jj.  South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et. seq.*;

kk. Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et. seq.*;

ll.  Vermont Consumer Fraud Act, Vt. Stat. Ann. Tit. 9, § 2451, *et. seq.*;

mm. Washington Consumer Fraud Act, Wash. Rev. Code § 19.86/0101, *et. seq.*;

nn. West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et. seq.*;

oo. Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et. seq.*

151.   Named Plaintiffs and Jane Doe Plaintiffs and class members assert causes of action under the consumer protection laws of their States, *supra*.

152.   Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair.

153.   Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

154.   Named Plaintiffs and Jane Doe Plaintiffs reasonably believed the Products contained more of the characterizing and emphasized ingredient, component or flavor than they did.

155.   Named Plaintiffs and Jane Doe Plaintiffs and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product or service type.

156.   After mailing appropriate notice and demand, Named Plaintiffs who reside in a State where notice is required prior to seeking damages under that State's Consumer Protection Statutes, will have mailed and/or have amended the present complaint to request damages. Cal. Civil Code § 1782(a), (d); Mass. UDAP, Mass. Gen Laws ch. 93A.

157.   Where applicable, subclasses of plaintiffs will seek injunctive and equitable relief and attorney fees for violations of relevant law, i.e., CLRA for California Subclass. Civ. Code § 1780(a); Cal. Bus. & Prof. Code § 17203.

158.   The representations and omissions were relied on by Named Plaintiffs and Jane Doe Plaintiffs and class members, who paid more than they would have, causing damages.

<u>Negligent Misrepresentation</u>

159.   Named Plaintiffs and Jane Doe Plaintiffs and class members incorporate by reference all preceding paragraphs.

160.   Defendant misrepresented the misrepresented the substantive, nutritional, compositional, organoleptic, sensory and/or other attributes of the Products.

161.   This duty is based on defendant's position as an entity which has held itself out as having special knowledge in the production, service and/or sale of the product type.

162.   Defendant had a duty to disclose and/or provide non-deceptive labeling of the Products and knew or should have known same were false or misleading.

163.   The representations took advantage of cognitive shortcuts made by consumers at the point-of-sale and their trust placed in defendant.

164.   Named Plaintiffs, Jane Doe Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

165.   Named Plaintiffs and Jane Doe Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Breach of Express Warranty and Implied Warranty of Merchantability,<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

166.   Named Plaintiffs and Jane Doe Plaintiffs incorporate by reference all preceding paragraphs.

167.   Defendant manufactures and sells Products which purport to contain a predominant amount of a specific characterizing ingredient compared to other ingredients.

168.  The Products, by their representations as "grahams" and "graham crackers," warranted to plaintiff and class members that they had more whole grain flour than refined flour, and contained nutrients such as fiber and protein in greater amounts than actually possessed.

169.  Defendant warranted such attributes to Named Plaintiffs, Jane Doe Plaintiffs and class members, when this was not truthful and was misleading.

170.  Defendant owed a special duty because it is the corporate decedent of the National Biscuit Company and is one of the largest users of the characterizing ingredient in the world, to represent all of the facts, instead of only those which would be viewed favorably.

171.  The Products warranted to plaintiff and class members that the ingredient on the front label and which constituted the product name, was the most predominant ingredient of the type (flour), in the Products.

172.  Plaintiff desired to purchase products which were as described by defendant.

173.  The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions and were not merchantable.

174.  To the extent notice may be required, Named Plaintiffs and Jane Doe Plaintiffs sent or intend to send notice to defendant and reserve all rights to amendment of the complaint.

175.  Named Plaintiffs, Jane Doe Plaintiffs and class members relied on defendant's claims, paying more than they would have, suffering damages.

<u>Fraud</u>

176.  Named Plaintiffs and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

177.  Defendant's purpose was to mislead consumers who seek products with more nutrients and higher quality ingredients which confer health benefits.

28

178.  Defendant, through its predecessors in interest, is one of the most storied food companies in the country and has knowledge to label the Products in a non-misleading manner.

179.  Defendant sells Products with the same name and brands to non-retail customers instead of to consumers.

180.  Defendant knows that consumers are generally more trusting of corporations and are inclined to accept front label representations at face value.

181.  Defendant knew it could sell the Products with the same name to consumers yet provide a "watered down," nutritionally inferior version to consumers.

182.  Defendant's intent was to secure economic advantage in the marketplace against competitors.

183.  Named and Jane Doe Plaintiffs and class members observed and relied on defendant's omissions and claims, causing them to pay more than they would have, entitling them to damages.

184.  Named Plaintiffs and Jane Doe Plaintiffs and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

<u>Unjust Enrichment</u>

185.  Named Plaintiffs and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

186. Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Named Plaintiffs and Jane Doe Plaintiffs demand a jury trial on all issues.

**WHEREFORE,** plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying named plaintiffs as representatives and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct such practices to comply with the law;

3. Injunctive relief for members of the State Subclasses pursuant to the consumer protection laws of their States;

4. An award of restitution and disgorgement pursuant to the consumer protection laws of the States where this is authorized;

5. An order enjoining Defendant, pursuant to the relevant state consumer protection laws, to remove and/or refrain from using representations on Defendant's Products described here;

6. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and consumer protection law claims, and other statutory claims;

7. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

8. Such other and further relief as the Court deems just and proper.

Dated:   July 3, 2019

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan (SS-8533)
505 Northern Blvd., Suite 311
Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com

1:19-cv-00302-ENV-SJB
United States District Court
Eastern District of New York

Keith Kennedy individually and on behalf of all others similarly situated

Plaintiff

- against -

Mondelēz Global LLC

Defendant

# First Amended Complaint

```
Sheehan & Associates, P.C.
 505 Northern Blvd., #311
  Great Neck, NY 11021
  Tel: (516) 303-0552
  Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: July 3, 2019

                                                      /s/ Spencer Sheehan
                                                      Spencer Sheehan